With our first case on the docket, Oyewole v. Rock Nation et al. You just want to say anything? Yes. Welcome. Before we begin, I would like to make a request. If I could reserve a little bit more time than the seven minutes at the end so that my client could make a statement on the record. Okay. If you're here present as counsel, we don't have clients make statements. Okay. Is it appropriate if I read his statement? You can do whatever you want. Okay. It's your argument. You have reserved three minutes for rebuttal. Right. Is it going to be something that the other side should be responding to as well if it's part of the argument? No. It's just his layman statement of what we've already said legally. Okay. Perhaps try to work it in in the first part of the argument just in case there is something that should be responded to. Oh, absolutely. Because they're not going to be responding to your rebuttal. No, I won't put that in the rebuttal. I'll put it in the first part. Okay. Yes. You may read whatever you would like. Okay. Assuming, well, it is relevant. We'll take that for granted. Okay. I am Wasemi, and I am here on behalf of plaintiff, appellant plaintiff, Abiodun Oyewole, to ask this court to reverse and remand the lower court's decision to dismiss the case. This case is about whether the defendant's use of Mr. Oyewole's phrase, party and bullshit, infringes upon Oyewole's multiple copyrights. Now, Mr. Oyewole began using this phrase in the mid-'60s in performances. He released his song in 1968. He incorporated the phrase of the punchline, music sound, repeated performances, where he repeated that phrase many, many times, oftentimes much longer than the song itself. It was so popular, he created and published his song as a soundtrack that was then used not as a movie, per se, but in a documentary. The movie is in development as we speak. It's in negotiations for the same. In 1970, he had an album come out, The Last Poets. In 1993, the song was released again in the 25th anniversary of The Last Poets album. In 1996, he published a book, On a Mission. So he has multiple copyrights for this song. We have the 1968 common law copyright. We have the 1970 words and music. We have the 1990 words, music, song, recording, performance, production, and lyrics. We have 1996 words from the book, Last Poets. 1996 words and music sound recording for the album, 25 Years. 2014 renewal of the 1990, and 2015 renewal of the 1970. So Mr. Oyaway's complaint was not conclusory in his statement for release that he sought. He was clear. He said, these are my copyrights for this phrase dating back to 1968, and even the latest renewal is of 2015. The Copyright Office consistently granted his application. He said, these are my copyrights. Defendants have listed a key signature phrase from my work, they knew about my work, and they failed to seek a license for it. So he believes the motion to dismiss was improper because the complaint on state was basically fine. There were facts there where he stated a claim for release. He also believed the decision was an error because in moving to dismiss, the defendants themselves did not overcome the presumption that his copyrights were valid. Secondly, he believed the service was actually, in fact, proper. The judge did extend time for service, and he did have all of the defendants that are here in this matter currently served. So the lower court, we believe, erred in finding after saying that the copyrights were okay, after saying that each use was similar, substantially similar, the court then went on to fair use. So we believe that there needs to be further development of the record to make this ultimate determination. What was wrong with the district court's fair use analysis? What was wrong with the decision? What was wrong with the district court's analysis of fair use? Why wasn't it, what was the error that she made? The court determined that the use was transformative, and we're saying that there cannot be any real engagement on that We're saying that the lower court should not grant a motion to dismiss when discovery itself, additional discovery could have easily provided relevant information. There was not enough information for the court to make that determination. What other information would be needed to determine whether the use was transformative? We believe that this matter is highly context sensitive, and so there were questions that should have, and usually are, answered before making this particular determination. Questions regarding, for example, the factor regarding the amount in nature could not be assessed without basing questions like, why did the defendants use the song? Why did they use the phrase, sorry, in their song?  What purpose was served by selecting that particular phrase? Did the defendants ever consider varying the wording of the phrase? The answer to these questions would then give us context as to whether the extent of the copying was consistent with the Castle Rock ruling, quoting Campbell, talking about whether there was more than necessary that was copied to further the purpose and character of the use. The second reason we believe that that decision to dismiss was an error is because the court does not make an analysis as to the market being served. Ms. Oyewole did put in the record that he is still a part of the hip-hop community. He's still a part of collaborations of some of the top hip-hop artists, Common, Nas, I don't know if the names are important, but these are top charting artists that he's still doing collaborations with. He's still doing albums with. Is that to test what collaborations he might do as opposed to the original song and its overlap in the market with the songs that are using the term? No. Why that is important, we believe, is that if he's a part of this community of people, at this point, other artists are assuming that he's done a collaboration with the defendants, and most of the artists that are coming and wanting to use that phrase, they're going to the defendants to get the license. So his market is being completely blurred in with their market. As of late, we only have one artist that has actually asked for a license from him for that particular phrase. Prior to, he did have artists coming to him, but because they took the words of the phrase, they just took over the market from him. But the confusion is because he's still a part of the hip-hop community. In fact, we were just talking about him being at Webster Hall,  and everyone's assuming that he did a collaboration with Rita Ora. Oh, your song is playing. And he's like, no, we didn't do a collaboration. But this happens to him on a, I don't want to say daily basis, but based on our conversations quite often, where people are assuming that he's done a collaboration with the defendants. And so therefore, that's why we believe that that information should have been before the court. The record should have been more fully developed. The only thing that court said was that the audience is different, and therefore the market could not have been usurped. You don't think that the court, having heard the two songs, couldn't make a determination without more that the second song and how it used that phrase was transformative? Absolutely, because in addition to that, the prior copyrights for this phrase included performance. And in the performance, that phrase goes on and on, sometimes two and three times longer than the song itself. And there's a copyright for that. If you look strictly at the lyrics and how the court determines that this is simply a poem, it's only at the end. But most people within the community, when they hear, when they think of his number, they call it party and bullshit. They don't call it revolution, which is actually the name. And a lot of times when a hook takes over a song, we'll just call it, oh, it's called party and bullshit. So that's how important that particular phrase has become to his work for the entire song. And none of that was considered. So the court didn't consider the market. The court didn't consider the community. None of that was in front of her, in front of the court, when the determination was made. And, therefore, we believe that the motion to dismiss should not have been granted at that point. Even this court, I believe in TCA television, stated that even though some courts do the side-by-side comparison, at this point it's a little early, which should be done at summary judge motion after the record has been developed a little bit more. And so we ask that this court would reverse the decision of the lower court. Thank you. You've reserved three minutes for rebuttal. Oh, I can use that to read the statement, right? As much as I can get it in here. Okay. It says that the suit came because I discovered a line in my most famous numbers was used by a number of artists without my permission. The line party and bullshit comes from a number I wrote in 1968. The poem talks about the black experience and various effects within the black community. And the line was said by me repeatedly so that the reader or the listener and the hearer could have a clearer understanding of what was going on at that time. That line has become so important to reinforce what's going on currently. So while times have changed, he does a comparison and contrast between when he originated in the Civil Rights era and what happened after the Obama era when the song made its resurgence. He's still been doing collaborations with various artists, dead press, the video Mind Sex Common, which received Grammy nomination, Chuck D, Rakim at the Apollo. He even said that the New York Times flew him out to L.A. to do an article where he was listed as an expert to discuss the connection between the older rappers and today's rappers, and that article appeared in the Easter Sunday Magazine section of the New York Times. And then he goes on again to say that a lot of people assume that he's done collaboration with them. He talks about 7th Streeter, and he said he doesn't mind that the phrase is being used and it's as popular as it was in the 60s, but he would appreciate being compensated for the usage. Thank you. Thank you. Was that information before Judge Nathan? Absolutely. That same letter was? The same. The letter was in front before Judge Nathan, or just concept? Not this exact word for word, but like I said, regarding the hip-hop community, his collaboration with artists, his licensing with 7th Streeter, and that he wants to be compensated for the usage. Thank you. Mr. Gross? Thank you, Your Honor. Edward Gross, appearing for defendants' appellees, Cobalt Music Publishing Ltd. and Downtown Music Publishing LLC. The issue before the court with respect to those two appellees is whether the district court abused its discretion in dismissing the claims against those entities for lack of service and abused its discretion in not granting plaintiff additional time to effectuate service on those entities after the district court had already granted two extensions of time to effectuate service and on the last occasion said that there was not going to be any further extensions of time to effectuate service of process. With respect to Cobalt Music Publishing Ltd., there's no dispute on this record that the process server didn't even go to an office of that entity or seek out an employee of that entity. They appeared at the office of a separate entity, Cobalt Music Publishing America, Inc., and attempted to serve a receptionist there, a low-level employee of a separate entity, Cobalt Music Publishing America. Cobalt Music Publishing Ltd. is a London entity. It actually alleged in plaintiff's complaint that it's a London-based entity. Had the plaintiff searched the Secretary of State's website for New York, he would have found that they are not authorized to do business in the state of New York, and on this record it's not disputed that they have no offices in the state of New York. So they didn't even show up at the right entity or seek to find an employee of that entity. With respect to Downtown, again on this record it's not disputed that the person they served was a receptionist, a low-level employee. When given an opportunity to submit an affidavit in opposition, the plaintiff did not submit an affidavit from their process server. The proof of service simply says that she's a receptionist authorized to accept service, but there's no elaboration as to how the process server came to that conclusion. Again, on this record it's not disputed that with respect to both, actually all three people who had served for the two parties, they never represented that they were authorized to accept service. Below, plaintiff argued that these individuals had actual authority to accept service on appeal. They have effectively abandoned that argument, and they argued only that they had apparent authority. Now the issue of apparent authority was never argued or briefed below, and we submit it should not be considered by this Court, but they haven't even established the elements to make that case before this Court. There's no allegation that they were directed to these people, that any employee of either of the appellees said that these people are authorized to accept service. So the issue of apparent authority, they haven't even established the elements necessary to present that argument. So there's no dispute on the record of this case that they didn't serve the right party, they didn't serve the right people, and I see my time is running out, so unless the Court has any questions, I'll yield my time to the other appellees. Thank you. Thank you, Mr. Rose. Ms. Paul. May it please the Court, Marsha Paul. I'm going to be speaking on fair use on behalf of all of the defendants who moved on that ground. My colleague, Ms. Reardon, will be addressing substantial similarity in the remaining issues in the case which were not reached by the Court below. With respect to fair use, listening to the songs in issue in this case, which are incorporated in the complaint and clearly within the province of this Court to look at, demonstrates conclusively that this is a classic case of fair use. Plaintiff argues that there is no one factor in the fair use analysis which is more important than any of the others. The Supreme Court and this Court have stated otherwise. Transformativeness, under the first factor, is the heart of the inquiry, and I submit that there is good reason for that, because whether something is transformative informs all of the factors, save for the issue of whether the defendant's works in this case are commercial, which they are, but that factor is not determinative under the law, and the issue of the nature of plaintiff's work, which we're told in numerous cases is rarely, if ever, determinative in the analysis. So I'd like to go to your question of counsel, Judge Livingston. What more would you need here on the issue of transformativeness? What is transformative, in the words of the Supreme Court and the Circuit, is what is reasonably perceived to be transformative. We've got a reasonableness standard subject to plausibility. We have the admission of plaintiffs, pure and simple, that the words that were used, party and bullshit, in each of these two songs were used in contravention of the message and purpose of plaintiff's song. Is that enough, standing alone, to conclude that something is transformative? Is the admission enough? I'm not sure, Your Honor. The fact that the work is taking a different slant on the phrase. Well, if you look at the case law, and there are many definitions of transformative running around since Judge LaValle's first use of it in the Harvard Law Review article. Campbell says, add something new, with further purpose, different character, altering the first with new expression, meaning, or message. Cariou makes changes to manifest a different aesthetic. Swatch doesn't have to alter the work itself to be transformative. Use Blanche, used as raw material in furtherance of a distinct creative or communicative objective that's different. Authors Guild, most recent, communicates something new and different from the original, or expands its utility. I submit that you take any one of those definitions, and the words of the song, as plaintiff admits, and, you know, the admission plays into it, show that this work is transformative. What does that mean? If a work is transformative, then we've already said the second factor is rarely determinative. May I have a moment more just to apply this? We then move to the third factor, and Campbell teaches, and subsequent cases from this court teach, that what is reasonable to take, the amount and substantiality of the taking on both a qualitative and a quantitative basis, varies with the purpose of the use. And what was taken here is a three-word phrase, one of which is and, and that phrase is not, obviously, quantitatively important to plaintiff's song. Would it make a difference if the phrase is used repeatedly in performance, even in the composition itself, if only four times? The performance of plaintiff's song, you're asking about? No, because this is not a sound recording case. It's not a performance case. We're talking about what is protected under the copyright that plaintiff claims to have, which is for the musical composition, which is the lyrics in the arrangement. It doesn't go to any particular performance or any given performance. We're limited to assessing just the written composition. Yes, that's correct. And then finally, just I know I'm over my time, but finally on the fourth factor, we know it's about market substitution. We also know that the more transformative the work is, going back to the first factor, the less likely there is to be an impact on the market for the original. And, yes, I agree, and it's fully consistent with the cases, that we're not really focusing on the market for potential derivatives. It's derivatives that actually are likely to be developed, and it's usurpation of that market, not criticism, which lessens that market. I'm sorry to have abbreviated so much, but under the circumstances, I think that shows why, A, this use is transformative, B, that drives the fair use analysis, and C, Judge Nathan was correct below to grant this motion, and the case can be affirmed on that ground. And I thank you very much for your indulgence. Thank you. Excuse me. Thank you, Ms. Paul. Ms. Reardon. Good morning, Your Honor. As Ms. Paul said, I am arguing on behalf of all appellees on the other grounds that this decision could be affirmed on. We have three issues we'd like to address before the Court. First is, in order to come to the Court seeking relief, plaintiff is required to have a copyright registration. In the complaint as pled, he has not pled the ownership of a valid copyright. The copyright at issue in 1970 was owned by Douglas Music. That certificate is considered to be prima facie valid, and there has been no facts otherwise showing it was assigned or transferred to a plaintiff. Given the Supreme Court's recent ruling in the Fourth Estate, that is an absolute bar to bring a case or to have standing in this matter. Another ground this case could be affirmed on is the short phrase doctrine. The phrase party and bullshit is simply not complex enough to warrant copyright protection under the law. But it's integral to this piece, though. I mean, it's an important phrase. It could be an important phrase, but there's no... I mean, in fact, the reason it would appear, the reason why the defendants used it was because it was an important phrase. I would say the defendants used the phrase because it was lingo or something that's common in culture, and people use different terminology and words at different points in time. There's no allegation in the complaint here that plaintiffs coined this phrase, crafted this phrase, created this phrase. In fact, counsel just argued it was popular in the 60s, this phrase, very similar to the phrase when the revolution comes was popular in the 60s. So you can combine otherwise unprotectable elements and get an overall copyright in the poem or in the performance or in something like that, but the phrase itself is not independently copyrightable, or standing alone, those three words, one of which is and, is not independently copyrightable. And then I would submit our third ground, just because there's not much time, the phrases as used by the defendants are not substantially similar to the way they were used in the original song. And that analysis of the tempo and the speed and the type of song is very similar to the fair use analysis, so I won't re-review that given our shortness of time and all of the different factors here, but we do submit that either the copyright ownership, the short phrase doctrine, or the substantial similarity doctrine are three alternative grounds on which this panel is able to affirm the lower court's decision. And unless you have any questions. Thank you. Thank you very much. Ms. Wasson, you have some time for rebuttal. If there's anything you would like to add or respond to. I wanted to state that my client did make that term popular in the 60s. That's what I was saying, that it became popular in the 60s because of his Civil Rights activism. He just made it popular. I did do the comparison between the Civil Rights era and what we have now, as well as talked about the use of the phrase in each song. I want to speak to the fact that the three words are not enough. My client never sought to get a copyright for three words. He wanted the song copyrighted, which is what he did. And the courts have said that the protection of the phrase is valid because the song is protected itself. So I find that a little disingenuous to say that he's trying to get copyright protection for three words. Can you speak to the appellee's contention that you failed to plead that there was a copyright registration? The attorney for the appellee just stood up and said, there's no copyright registration, and you didn't plead that in your complaint. There's no copyright registration. For the song under his name. I think that's what they just said. There is copyright registration for the song. It's actually in the appendix. But they indicate that you have not pled that in your complaint. Did you plead it in your complaint? That there was a copyright registration in the song? Well, we stated the song recording, the words, music, and the lyrics. Okay. Music. Let's take a look. Okay. As far as the other thing I wanted to point out is that the court did not do, the lower court did not do a careful, what is the analysis called, context-specific analysis where you look at more than just the sound. She just did what it seemed to be an aural, just listening. And, you know, so she listened to it and she made the determination. And we thought that it would be a more fragmented, literal similarity test that should have been done. And I think that's it for my time. Oh, they didn't just take the words. They took the hook, the beat. If you listen to it, it's absolutely identical. And they haven't actually denied that. They said that he couldn't claim, but they didn't say that it's not identical. Okay. Thank you. Thank you to all four of you. We'll reserve decision in this case. So.